DINO G. ZAMPINI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zampini v. Commissioner
Docket No. 3337-89
United States Tax Court
T.C. Memo 1991-395; 1991 Tax Ct. Memo LEXIS 460; 62 T.C.M. (CCH) 475; T.C.M. (RIA) 91395; August 13, 1991, Filed *460 Decision will be entered under Rule 155. David F. Dunn, for the petitioner. Keith L. Gorman, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION Petitioner claims that certain payments he made in 1985 to his former wife and to third parties were alimony. Petitioner also claims head of household status for 1985 based on his son who lived with him for 3 months in 1985. As discussed below, we hold that portions of the direct and indirect payments petitioner made in 1985 are deductible as alimony, and that petitioner is not entitled to file as head of household for 1985. In a deficiency notice dated November 18, 1988, respondent determined a $ 5,240.30 deficiency in petitioner's Federal income tax for 1985, and additions to tax for negligence under section 6653(a)(1) and (2)[1] in the amount of $ 5 and 50 percent of the interest due on the deficiency. The deficiency resulted from respondent's disallowance of a $ 10,640 alimony deduction. *461 In an amended petition, petitioner claimed an overpayment of $ 1,581, based on an increased alimony deduction. At trial, respondent moved to amend the pleadings to conform to the proof, seeking to challenge petitioner's claim of head of household status on his 1985 tax return. We granted the motion. In the amended answer, respondent asserted an increase in deficiency to $ 10,847.85, and additions to tax of $ 542.39 under section 6653(a)(1) and 50 percent of the interest due on the total deficiency under section 6653(a)(2). After concessions, the issues for decision are: (1) Whether payments by petitioner to his former wife and to third parties in 1985 were alimony for Federal income tax purposes. We hold that a portion of the payments petitioner made directly to his former wife were alimony. In addition, concerning petitioner's indirect payments, we hold that: One-half of the principal mortgage payments that petitioner made on the marital home was alimony; no portion of the payments petitioner made in 1985 toward automobile insurance was alimony; and no portion of the telephone, cablevision, and utility payments which petitioner made for the marital home was alimony. (2) *462 Whether petitioner was entitled to file as a head of household on his 1985 tax return. We hold that he was not. (3) Whether any of petitioner's underpayment of tax was attributable to negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2). We hold that the negligence addition of section 6653(a)(1) applies; as to section 6653(a)(2), we hold that it does not apply with respect to the alimony issue, but that it does apply with respect to the head of household issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
Petitioner lived in Blandon, Pennsylvania, when the petition was filed. Petitioner married Gloria Zampini in 1964. The Zampinis had three children: Michael, Christine, and Peter. In 1985 the children were ages 20, 18, and 14, respectively. The Zampinis purchased a home in Scotia, New York, in 1977. They held title to it as tenants by the entirety and were jointly liable for the mortgage on the home. The Zampinis separated in 1981 and were divorced in 1988. They entered into a written separation agreement in February 1981, the provisions of which were incorporated into the divorce *463 decree. 2. Separation Agreement
The separation agreement gave petitioner and Mrs. Zampini joint custody of their children during the children's minority. It indicated that the children's principal residence was to be with Mrs. Zampini, but granted petitioner unlimited visitation rights. The agreement enumerated the following financial obligations of petitioner to his family: First, the agreement provided that petitioner pay "as a portion of his obligations for maintenance of the wife and child support the mortgage, taxes, insurance, telephone, cablevision and utility expenses" on the marital premises until: (1) The children's emancipation; (2) Mrs. Zampini's remarriage; or (3) Mrs. Zampini's death. Second, the agreement required petitioner to make weekly payments to Mrs. Zampini consisting of $ 40 for her maintenance and $ 120 for child support. It specified that these weekly payments should include 40 percent of any salary increase petitioner received and 40 percent of his annual bonus, to be allocated 10 percent to alimony and 30 percent to child support. The agreement obligated petitioner to provide child support until all three children were emancipated. It specified *464 several events which would constitute emancipation. One of these events was "Permanent residence away from the residence of the mother." The agreement provided that residence at college would not constitute emancipation. The agreement also provided that employment would constitute emancipation as follows: Engaging in full-time employment upon and after attainment of the child of the age of eighteen (18) years, except that (i) engaging by the child in partial, part-time or sporadic employment shall not constitute emancipation, and (ii) engaging by the child in full-time employment during vacation and summer periods shall not be deemed emancipation. Emancipation stemming from employment shall be deemed terminated and nullified upon the cessation by the child from full-time employment, unless the child shall be receiving unemployment benefits or the child shall be employable but is not actively seeking employment. The period, if any, from such termination until the earliest of any of the other events herein set forth shall, for all purposes under this agreement, be deemed a period prior to the occurrence of such emancipation.
Under the agreement, petitioner was responsible *465 for paying the children's college expenses and all joint debts of the marriage incurred before the separation agreement. Petitioner was also responsible for insurance on a 1980 Mustang. Mrs. Zampini bought a new car, a Chrysler LeBaron, in 1984. 3. Events of 1985
Petitioner lived in New York State from January through August 1985. During this time, he had homes at Gloversville and Sacandaga Lake. He lived in Florida for the remainder of 1985. During the same year, Mrs. Zampini lived with her two younger children, Christine and Peter, at their home in Scotia, New York, where the children attended school. Christine and Peter spent their summer with petitioner at his home on Sacandaga Lake. Prior to 1985, the Zampinis' eldest child, Michael, lived with his mother in Scotia, New York. From January until May 1985, Michael lived in an apartment about 10 miles from Schenectady County Junior College, where he attended school at night. Petitioner maintained this apartment for Michael. During this time, Michael worked full time during the day for Coleco Industries as a technician. Michael graduated with an associate's degree in May or June of 1985. Michael lived with petitioner *466 at the Sacandaga Lake home sometime between mid-May and mid-August 1985. After graduating, Michael worked part time for Coleco while looking for an engineering position. At this time, Michael did not intend to return to college. When he realized that he needed more education for this type of position, Michael began applying to 4-year colleges. Michael was accepted at Brockport College during the summer of 1985. He began attending school there in the middle of August. At that time, he moved into an apartment close to the college which petitioner maintained for him. Michael lived at this apartment for the remainder of 1985. 4. Petitioner's 1985 Payments
During 1985, petitioner wrote 26 checks to Mrs. Zampini totaling $ 11,008.69. All but three were for $ 391.65. The exceptions were a $ 480.07 check dated January 11, a $ 471.65 check dated March 22, and a $ 1,050 check dated November 17. The November 17 payment was to reimburse Mrs. Zampini for the children's Christmas gifts, which petitioner and Mrs. Zampini purchased jointly. In addition to his direct payments to Mrs. Zampini, petitioner made several payments to third parties in 1985. Petitioner paid $ 1,400.78 to *467 New York Telephone Company (New York Telephone) for telephone service for the Scotia home and at least one of Michael's college apartments. Petitioner produced four statements from New York Telephone which were for the Scotia home and 11 checks which he wrote to New York Telephone in 1985. Ten of these checks contain the telephone number of the Scotia home and total $ 1,286.66. Petitioner paid $ 1,796.54 to Niagara Mohawk Power Corporation (Niagara Mohawk), which provided utility services to the Scotia home, petitioner's Gloversville home, and at least one of Michael's college apartments. Petitioner produced three statements for utilities which specifically refer to the Scotia home. These statements total $ 783.34. In addition, petitioner wrote two checks to Niagara Mohawk in 1985, totaling $ 397.32, which show the account number of the Scotia home account and which are not payment for any of the three statements. Petitioner also paid $ 240.60 to Jones Intercable, Inc., in 1985. Petitioner paid $ 6,382.40 to Northeast Savings Bank in 1985. This amount was applied to the mortgage obligation on the Scotia home as follows: $ 1,345.23 as principal; $ 2,795.49 as interest; and *468 $ 2,241.68 as property taxes. Petitioner paid $ 1,949.50 to the Atlantic Companies which provided automobile insurance to Michael and to Mrs. Zampini. 5. Petitioner's 1985 Tax Return
Petitioner and his wife filed separate Federal income tax returns for 1985. Petitioner claimed head of household status on his 1985 return. On Schedule A, petitioner claimed a $ 10,247 deduction for mortgage interest paid. This amount included: $ 1,397.74, representing one-half of the interest paid to Northeast Savings Bank for the Scotia home; and $ 1,182.11, representing interest paid to Glendale Federal Savings and Loan. Petitioner also claimed a $ 4,839 deduction for real estate taxes paid on Schedule A of his 1985 return. This amount included $ 1,121, representing one-half of the taxes paid to Northeast Savings Bank for the Scotia home. OPINION 1. Statute of Limitations
Petitioner argues that consideration of his Schedule A home mortgage interest and real estate tax deductions and his head of household status, issues raised by respondent in the notice of deficiency and amended answer, is barred by the statute of limitations under section 6501(a). Petitioner premises his argument *469 on the idea that, in proceedings in which respondent determines that petitioner has committed fraud, the burden of proof is on respondent to show why the statute of limitations should be lifted. Petitioner's focus on the issue of fraud is misplaced because respondent has not determined that petitioner committed fraud. Section 6503(a) suspends the running of the period of limitations from the time a deficiency notice is mailed until 60 days after a decision of the Tax Court becomes final. The notice of deficiency was sent to petitioner on November 18, 1988, and thus was issued within the period of limitations for taxable year 1985. Petitioner filed a timely petition with this Court. Thus, the running of the period of limitations is suspended until 60 days after the decision of this Court becomes final. The timely mailing of a notice of deficiency for a taxable year suspends the running of the limitations period for all issues with respect to that year, not just those raised in the notice of deficiency. Sec. 6214(a); Teitelbaum v. Commissioner, 346 F.2d 266, 267 (7th Cir. 1965), affg. T.C. Memo 1964-141; Weaver v. Commissioner, 25 T.C. 1067, 1086 (1956); *470 Ticker Publishing Co. v. Commissioner, 46 B.T.A. 399, 415 (1942). Accordingly, consideration of these additional issues raised in respondent's notice of deficiency and amended answer is not barred by the statute of limitations. 2. Alimony Payments
The next issue for decision is whether payments petitioner made to Mrs. Zampini and to third parties in 1985 were alimony for Federal tax purposes. Under section 215, amounts paid as alimony or separate maintenance are deductible as alimony if those payments are includable in the recipient's gross income under section 71.[2]Yoakum v. Commissioner, 82 T.C. 128, 134 (1984). Section 71 applies only to payments made in recognition of the general obligation to support which is made specific by the decree. Yoakum v. Commissioner, supra.Payments which are part of a property settlement are capital in nature and are not subject to section 71. Yoakum v. Commissioner, supra; Thomas v. Commissioner, 50 T.C. 522 (1968); Price v. Commissioner, 49 T.C. 676 (1968). *471 Several requirements must be met before payments made pursuant to a written separation agreement may be deducted by the payor and included in the gross income of the recipient. The first three requirements are: (1) The husband and wife must be separated; (2) there must be a written separation agreement; and (3) the husband and wife must file separate income tax returns. Sec. 71(a). The payments must also be made under the separation agreement and in discharge of a legal obligation imposed "because of the marital or family relationship." Sec. 71(a)(1). The payments must be in the nature of support rather than a property settlement. Wright v. Commissioner, 543 F.2d 593, 597 (7th Cir. 1976), affg. 62 T.C. 377, 388-389 (1974). The determination of whether payments are in the nature of support or part of a property settlement is not controlled by the labels assigned to the payments by the Court in the divorce decree or by the parties in their agreement. Beard v. Commissioner, 77 T.C. 1275, 1283-1284 (1981); Hesse v. Commissioner, 60 T.C. 685, 691 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975). *472 Rather, the determination rests upon all of the surrounding facts and circumstances. Yoakum v. Commissioner, supra at 140; Beard v. Commissioner, supra at 1284; Gammill v. Commissioner, 73 T.C. 921, 926-927 (1980), affd. 710 F.2d 607 (10th Cir. 1982). In Beard v. Commissioner, supra at 1284-1285, we delineated factors which indicate that payments are more like a property settlement than a support allowance: (1) That the parties in their agreement (or the court in its decree) intended the payments to effect a division of their assets; (2) that the recipient surrendered valuable property rights in exchange for the payments; (3) that the payments are fixed in amount and not subject to contingencies, such as the death or remarriage of the recipient; (4) that the payments are secured; (5) that the amount of the payments plus the other property awarded to the recipient equals approximately one-half of the property accumulated by the parties during marriage; (6) that the need of the recipient was not taken into consideration in determining the amount of the payments; and (7) *473 that a separate provision for support was provided elsewhere in the decree or agreement. Conversely, the absence of one or more of the above factors may tend to indicate that the payments are more in the nature of a support allowance. [Citations deleted.]
The final requirement of section 71(a) is that the payments qualify as periodic payments. Section 71(c)(1) provides that payments generally are not treated as periodic if they are made to discharge a part of an obligation the principal sum of which is specified in the legal separation agreement or the divorce decree. Kent v. Commissioner, 61 T.C. 133 (1973). Section 71(b) requires that payments not be "fixed" by the agreement as payable for the support of the payor's minor children. For purposes of section 71(b), a minor is a child who has not reached 21 years of age. Borbonus v. Commissioner, 42 T.C. 983, 991-992 (1964). In Commissioner v. Lester, 366 U.S. 299, 305-306, 6 L. Ed. 2d 306, 81 S. Ct. 1343 (1961), the Supreme Court held that an agreement directing a reduction by one-sixth of payments payable for the support of the taxpayer's children upon a child's marriage, emancipation, or death, *474 did not adequately fix the payments as child support. The Court interpreted the word "fix" to mean that the allocations to child support must be "specifically designated" in the agreement and not left to "determination by inference or conjecture." Petitioner and Mrs. Zampini were separated throughout 1985. A written separation agreement was in effect during that year. In addition, they filed separate income tax returns for 1985. Accordingly, to characterize the various payments petitioner made in 1985, it is necessary to decide: (1) Whether petitioner made the payments under the separation agreement and because of his marital or family relationship; (2) whether the payments were "periodic" in nature; and (3) whether the agreement specifically "fixed" the payments as child support. a. Payments Petitioner Made Directly to Mrs. Zampini
In 1985, petitioner made $ 11,008.69 in payments directly to Mrs. Zampini. This included $ 168.42 in unexplained additional payments and $ 1,050 as reimbursement for the children's Christmas gifts. Petitioner argues that Michael was emancipated during 1985 and, thus, 60 percent of these payments is alimony. Alternatively, petitioner argues *475 that, if Michael was not emancipated during this time, 40 percent constitutes alimony. The separation agreement required petitioner to make weekly payments of $ 40 for Mrs. Zampini's maintenance and $ 120 for child support, to be increased by 40 percent of his salary increases and annual bonuses. Although petitioner has not shown the amount of the weekly payments that is attributable to his salary increases and annual bonuses, this amount, along with the weekly amount specified in the agreement, was made under the separation agreement and because of petitioner's marital and family relationship. Any additional amounts are not alimony because they were not made under the separation agreement. Yoakum v. Commissioner, supra.
Accordingly, petitioner's reimbursement to Mrs. Zampini for the children's Christmas gifts is not alimony. In addition, petitioner has not shown that the additional amount of $ 168.42 is alimony. The weekly payments are periodic payments because petitioner did not make the payments to discharge a principal sum specified in the separation agreement. Kent v. Commissioner, supra at 135-136. The language of the *476 agreement specified a portion of the weekly payments as child support -- namely, $ 120 plus 30 percent of petitioner's salary increases and annual bonuses. Petitioner argues, however, that Michael was emancipated in 1985, and that, pursuant to the separation agreement, petitioner was no longer obligated to provide child support for him that year. The separation agreement enumerates various circumstances that would result in a child's emancipation. Two are relevant to this situation: permanent residence away from Mrs. Zampini, not including residence at college, and full-time employment of the child, under certain circumstances. We will discuss each in turn. Prior to 1985, Michael lived with Mrs. Zampini in the Scotia home, his permanent residence at that time. In January, Michael moved into an apartment 10 miles from Schenectady County Junior College, where he attended school. This represents residence at college, not permanent residence away from Mrs. Zampini. During the summer of 1985, Michael lived with petitioner at the Sacandaga Lake home. Michael's brother and sister were also living in this home for the summer. During the summer, Michael decreased his work schedule *477 from full time to part time. From August through the end of 1985, Michael lived in a second apartment close to his new school. This, again, represented residence at college, and not a permanent residence. The separation agreement provides that full-time employment after age 18 constitutes emancipation under certain circumstances. It states, however, that "Emancipation stemming from employment shall be deemed terminated and nullified upon the cessation by the child from full-time employment," unless the child is either receiving unemployment benefits or is employable but not actively seeking employment. Michael was employed full time from January through mid-May 1985. He was emancipated during that time. Furthermore, because Michael was "employable but not actively seeking employment" when he began working only part time in mid-May, he remained emancipated. Petitioner testified that he received a salary increase in January 1985, which he included in the January 11 check. In addition, petitioner indicated in his reply brief that he included the required percentage of this increase in his 1985 payments. Petitioner has not, however, presented any evidence to corroborate this *478 statement. In addition, petitioner did not specify the amounts of any salary increases or bonuses that he received from the time the separation agreement was executed in 1981. It is unclear, therefore, whether the increase in the January 11 check is attributable entirely to the raise or, in addition, to some other factor. It is also unclear why the check dated March 22 was written for an amount larger than the standard payment. Petitioner failed to show the portion of his weekly payments to Mrs. Zampini in 1985 made for alimony or child support, or the portion attributable to his annual bonuses or salary increases. However, respondent conceded in its opening brief that, if Michael was emancipated in 1985, which we find that he was, petitioner paid $ 3,000.50 in alimony. [3] Accordingly, we find that petitioner paid $ 3,000.50 in alimony to Mrs. Zampini in 1985. *479 Respondent argues that evidence of petitioner's and Mrs. Zampini's interpretation of the separation agreement regarding the amount of the reduction of the weekly payments upon Michael's emancipation should not be allowed. Because we do not decide the proper amount of the weekly payments, but only the amount of alimony, we need not reach this issue. b. Payments Petitioner Made to Third Parties
Petitioner made payments to third parties totaling $ 11,769.82 in 1985. The separation agreement obligates petitioner to make most of these payments "as a portion of his obligations for maintenance of the wife and child support," but it does not fix any part of these payments as child support, as required by Commissioner v. Lester, supra. To determine what portion of these indirect payments, if any, represents child support, we would be forced to resort to conjecture, contrary to Commissioner v. Lester, supra.Thus, we conclude that none of the indirect payments was child support. i. Mortgage Principal, Interest, and Taxes
Petitioner paid $ 6,382.40 to Northeast Savings Bank in 1985. He testified that these payments were for *480 the mortgage principal, interest, and taxes on the Scotia home. Petitioner argues that 50 percent of these payments is alimony. The separation agreement specified that petitioner pay "the mortgage [and] taxes * * * on the marital home." Thus, petitioner's payments toward the mortgage on the Scotia home were made under the agreement. In addition, the payments were made because of petitioner's marital and family relationship. The payments are "support" rather than a "property settlement." Beard v. Commissioner, supra. For example, there is no indication that petitioner and Mrs. Zampini intended these payments to effect a division of their assets or that Mrs. Zampini surrendered property rights in exchange for the payments. The payments were subject to contingencies -- the children's emancipation, Mrs. Zampini's remarriage, or her death. Finally, the agreement specified that petitioner make the payments "as a portion of his obligations for maintenance of the wife." Petitioner's payments of the mortgage principal, interest, and taxes on the marital home were periodic in nature. In Mace v. United States, an unreported case ( S.D. Cal. 1964, 1964 U.S. Dist. LEXIS 8536, 14 A.F.T.R.2d (RIA) 5381, 64-2 U.S. Tax Cas. (CCH) P9732), *481 the Court held that monthly payments by a former husband in satisfaction of a mortgage on property held by the former spouses as joint tenants were periodic in nature and did not constitute settlement of property rights between the parties. Although petitioner's payments were made under the separation agreement because of petitioner's marital and family relationship, and were periodic in nature, the payments are alimony only to the extent that they satisfy an obligation of petitioner's former spouse. Taylor v. Commissioner, 45 T.C. 120, 123-124 (1965). Petitioner and Mrs. Zampini held the Scotia home as tenants by the entirety. A tenancy by the entirety vests in each spouse a present interest in the jointly held property. Mirsky v. Commissioner, 56 T.C. 664, 672-673 (1971). In Taylor v. Commissioner, 45 T.C. 120, 123 (1965), we stated that: In the usual situation, where there is co-ownership of property, such as involved herein, the husband and wife are personally liable on the mortgage loan. Each payment by one party pro tanto discharges the legal obligation of the other party to the lender. Under local law *482 each party is generally entitled to a contribution of one-half of any mortgage payment from the other. 2 Tiffany, Law of Real Property, sec. 460 (3d ed. 1939). In such circumstances, an agreement and decree imposing the obligation for the entire mortgage payments on the husband cuts off the husband's right of contribution which would otherwise arise each time a payment was made. As a result, each payment by the husband appears to confer a current benefit upon the wife by discharging pro tanto her legal obligation to the lender, and relieving her of her obligation to contribute. [Emphasis in original.]
In 1985, petitioner and Mrs. Zampini were jointly liable for the mortgage on the Scotia home. Accordingly, with respect to the mortgage principal payments, half of the payments petitioner made conferred a benefit on Mrs. Zampini and, thus, represent alimony. The other half reduced petitioner's own obligation and does not represent alimony. Respondent argues that petitioner may deduct only one-half of the interest and taxes he paid on the marital home on Schedule A of his income tax return and that Mrs. Zampini is entitled to deduct the other half on Schedule A of her income *483 tax return. We disagree. As discussed below, we conclude that petitioner may deduct the full amount of the interest and taxes he paid toward the Scotia home in 1985. Section 163 allows as a deduction interest paid or accrued within the taxable year. Section 164 allows as a deduction state and local real property taxes for the taxable year within which the taxes are paid or accrued. When property is held as tenants by the entirety, a spouse may deduct those interest and tax payments made from his own funds during the year. Finney v. Commissioner, T.C. Memo 1976-329. In Castaneda-Benitez v. Commissioner, T.C. Memo 1981-157, we held that a taxpayer who made mortgage payments pursuant to a divorce decree on the marital home, which he jointly owned with his former spouse, was entitled to deduct the full amount of the mortgage interest that he paid. In Castaneda-Benitez, we said: Respondent having determined that petitioner is entitled to a deduction under section 215 for half of the mortgage payments made pursuant to the divorce decree on the marital home because the home was owned one half by petitioner's former wife, he argues *484 that he was correct in disallowing an interest deduction with respect to that same half. His position is attractive by reason of consistency, but erroneous. A deduction in respect of the payment of interest on a joint obligation is allowable to whichever of the parties liable thereon makes the payment out of his own funds. [Castaneda-Benitez v. Commissioner, T.C. Memo 1981-157, 41 T.C.M. (CCH) 1213, 1214, T.C.M. (RIA) 81157 at 524.]
Accordingly, the only portion of petitioner's 1985 payments of the mortgage principal, interest, and taxes on the Scotia home which represents alimony, is one-half of the principal payments. Petitioner may, however, deduct the full amount of the interest and taxes he paid on the Scotia home pursuant to sections 163 and 164. ii. Auto Insurance
Petitioner made payments totaling $ 1,949.50 for automobile insurance premiums in 1985. Petitioner testified that $ 926 of this amount was for premiums for Mrs. Zampini. The remainder was to insure Michael. The only obligation the separation agreement specifically imposes on petitioner with respect to automobile insurance is insurance on a 1980 Mustang which Mrs. Zampini operated *485 at the time of the separation agreement. Mrs. Zampini bought a Chrysler LeBaron in 1984. In another section of the agreement, "insurance" is used as follows: "The husband shall pay * * * the mortgage, taxes, insurance, telephone, cablevision and utility expenses, including heat and ordinary and necessary repairs on the marital premises." However, this provision is contained in the context of the marital home. Therefore, we conclude that this section imposes no duty on petitioner to provide automobile insurance. In Barrer v. Commissioner, T.C. Memo 1981-256, we held that payments by a former husband to his son's school that were made voluntarily, and not in discharge of a legal obligation imposed upon him under the terms of the divorce decree, were not deductible by him as alimony. The separation agreement only required petitioner to pay for automobile insurance on behalf of Mrs. Zampini for the 1980 Mustang. Petitioner does not assert that the insurance payments he made were for this car. Accordingly, none of the payments petitioner made in 1985 toward automobile insurance represent alimony. iii. Telephone, Cablevision, Utilities
The separation agreement *486 requires petitioner to pay "as a portion of his obligations for maintenance of the wife and child support," the telephone, cablevision and utility expenses on the marital premises. These payments, or a portion of them, were not fixed as child support by the agreement. Accordingly, no portion of these payments represents child support. Commissioner v. Lester, supra.
The payments were made under the separation agreement because of petitioner's marital and family relationship. They were periodic in nature. Beard v. Commissioner, supra.
Respondent argues that, although Mrs. Zampini received a partial benefit from these payments, because petitioner made the payments directly to the providers of services, these payments were not "received" by Mrs. Zampini and, thus, do not represent alimony. In support of this argument, respondent cites Lester, claiming that "Lester makes clear that the concept underlying including undifferentiated support payments in the wife's income is that she is free to spend such monies received under a claim of right as she sees fit." We do not agree. We read Lester to mean that the reason why undifferentiated *487 support payments are included in a spouse's income is because they are not specifically fixed as child support. Although the Court in Lester indicated that the wife in that case was free to spend the money she received as she wished, the Court implied that the result would remain unchanged even if the wife had been required to spend the money in a certain manner. The Court said that it was unconcerned with any restrictions that might be imposed by State law on the wife "to use a certain portion of the payments solely for the support of the children." Commissioner v. Lester, 366 U.S. at 304. The Court explained that "The Code merely affords the husband a deduction for any portion of such payment not specifically earmarked in the agreement as payable for the support of the children." 366 U.S. at 304. Respondent argues, relying on Hyde v. Commissioner, 301 F.2d 279, 282 (2d Cir. 1962), affg. 36 T.C. 507 (1961), that, since the indirect payments here were not for Mrs. Zampini's exclusive benefit, they do not represent alimony. In Hyde, a divorced wife was required to include as income payments her former *488 husband made to insurance companies for life insurance policies irrevocably assigned to her. The court said that "the inclusion of the amount of the premium payments in petitioner's income rests on the well-established principle that a cash basis taxpayer must include in gross income amounts paid to third parties exclusively for the benefit of the taxpayer that are not intended to be gifts." 301 F.2d at 282. Respondent's reliance on Hyde is misplaced. Third party payments not exclusively for the benefit of the recipient spouse, if made under a divorce decree or separation agreement not specifically fixing a portion of the payments as child support, represent alimony. In Graham v. Commissioner, 79 T.C. 415 (1982), we held that payments made by a former husband for utilities on a family home, which were made under a divorce decree and which did not adequately fix a certain portion of the payments as child support, were alimony. In LaBow v. Commissioner, T.C. Memo 1983-417, we held that payments by a former husband for cablevision, telephone, and electric bills, which he made in support of his former wife and children *489 under a support order which failed to specify a portion of the payments for the children, constituted alimony. Finally, respondent argues that petitioner had contractual arrangements with the providers of the utility services and, thus, petitioner's utility payments represented petitioner's own legal obligations and not those of Mrs. Zampini. Respondent argues further that, under New York law, petitioner had a legal obligation to pay these expenses to support his family. Thus, respondent concludes, the payments were not alimony. We do not agree. We have held that payments by a former husband for utilities on a family home, which he made in support of his former wife and children, were alimony. Graham v. Commissioner, supra; LaBow v. Commissioner, supra.
Accordingly, we must decide if petitioner made the telephone, cablevision, and utility payments under the separation agreement and because of his marital and family relationship. Because petitioner owned more than one home in New York and maintained two apartments for Michael in New York, petitioner must show that the telephone, cablevision, and utility payments were for the Scotia *490 home, and not for one of the other homes. Petitioner paid $ 1,400.78 to New York Telephone in 1985. He made telephone payments that year for at least two residences: his own home and Michael's apartments. At trial, petitioner produced four statements from New York Telephone which were for the Scotia home. He also produced 11 checks which he had written to New York Telephone in 1985. Ten of these checks contain the phone number of the Scotia home and total $ 1,286.68. We find that this amount is alimony. Petitioner paid $ 240.60 to Jones Intercable, Inc., in 1985. Respondent conceded, at trial, that these checks were for the Scotia home. Thus, this amount is also alimony. Petitioner paid $ 1,796.54 in 1985 to Niagara Mohawk. In 1985, petitioner made utility payments to Niagara Mohawk for at least two homes: his own home and the Scotia home. At trial, petitioner produced three statements for utilities which referred to the Scotia home. These statements total $ 783.34. In addition, petitioner wrote two checks to Niagara Mohawk in 1985, totaling $ 397.32, bearing the account number of the Scotia home and which are not payment for any of the three statements. Thus, we find *491 that $ 1,180.66 of these amounts is alimony for 1985. 3. Head of Household Status of Petitioner
The next issue for decision is whether petitioner is entitled to head of household filing status for 1985. a. Burden of Proof
Respondent raised this issue for the first time at trial by moving to amend the pleadings to conform to the proof. The motion was granted. The burden of proof is on respondent for new matters not included in the notice of deficiency. Rule 142(a). b. Head of Household Status
Under section 2(b)(1), to qualify as head of a household, a person must maintain, as his home, a household which is the principal place of abode of either his own child or another qualifying individual for more than half of the taxable year. We note that the household need not be the taxpayer's principal place of abode, but it must be his home, where he and the qualifying individual live together for the requisite period of time. Muse v. United States, 434 F.2d 349, 353 (4th Cir. 1970). Section 1.2-2(c)(1), Income Tax Regs., allows for temporary absences from the household due to special circumstances. It states that "A nonpermanent failure to occupy *492 the common abode by reason of illness, education, business, vacation, military service, or a custody agreement under which a child or stepchild is absent for less than 6 months in the taxable year of the taxpayer, shall be considered temporary absence due to special circumstances." Accordingly, we must decide whether any of petitioner's residences constituted Michael's principal place of abode for more than half of 1985. In 1985, petitioner maintained residences at Gloversville and Sacandaga Lake, New York, and, later in the year, in Florida. Michael did not live at petitioner's Gloversville or Florida home for any portion of 1985. For most of 1985, Michael lived on his own in two separate apartments, close to the schools he attended. Michael lived at the Sacandaga Lake home from mid-May through mid-August of 1985 -- a period of three months. Because none of petitioner's residences constituted Michael's principal place of abode for more than 6 months in 1985, we find that petitioner is not entitled to claim head of household status on his 1985 tax return. 4. Negligence
Section 6653(a) imposes an addition to tax if any part of the underpayment is due to negligence or intentional *493 disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The taxpayer must show that he acted reasonably and prudently and exercised due care. Neely v. Commissioner, supra.
As a general rule, taxpayers are charged with knowledge of the law. Harrington v. Commissioner, 93 T.C. 297 (1989); Donahue v. Commissioner, T.C. Memo 1991-181. However, the addition to tax for negligence will not be imposed where the deficiency was due to a mistaken interpretation of the law on which there can be an understandable difference of opinion. Wiggins v. Commissioner, 92 T.C. 869, 873 (1989), affd. 904 F.2d 311 (5th Cir. 1990); Dillin v. Commissioner, 56 T.C. 228, 248 (1971); Lemery v. Commissioner, 54 T.C. 480, 490 (1970); *494 Marcello v. Commissioner, 43 T.C. 168, 182 (1964), affd. in part and revd. in part 380 F.2d 499, 506 (5th Cir. 1967); Standish v. Commissioner, 4 T.C. 995, 1001 (1945), affd. 154 F.2d 1022 (9th Cir. 1946). Based on the complexity of the law concerning alimony and child support payments, and based on the reasonable belief of both petitioner and Mrs. Zampini that Michael was emancipated during 1985, we find that petitioner was not negligent with respect to the issue of whether payments by petitioner to Mrs. Zampini and to third parties in 1985 were alimony for Federal tax purposes. The law, however, is reasonably clear concerning head of household status. We believe that, under the circumstances of this case, it was not reasonable for petitioner to believe that Michael lived with him for more than one-half of 1985 -- the taxable year in question. We find that petitioner was negligent with respect to the issue of whether petitioner was entitled to claim head of household status on his 1985 tax return. Accordingly, petitioner is liable for an addition to tax under section 6653(a)(1) with respect to the entire *495 underpayment and under section 6653(a)(2) with respect to the portion of the underpayment attributable to the head of household issue. Accordingly, Decision will be entered under Rule 155. Footnotes
1. Section references are to the Internal Revenue Code as amended and in effect for the year at issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sections 71 and 215 were amended by the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 795. The 1984 amendments apply to divorce or separation instruments executed after December 31, 1984. They also apply to such instruments executed before January 1, 1985, but modified on or after such date, if the modification expressly provides that the 1984 amendments govern. The Zampinis separated in 1981 and were divorced in 1988. They entered into a written separation agreement in 1981, the provisions of which were incorporated into the divorce decree. There is nothing in the record to indicate that the parties amended either the separation agreement or the divorce decree to provide that the 1984 amendments govern. Accordingly, all references to sections 71 and 215↩ are to these sections as in effect prior to their amendment by the 1984 Act.
3. Respondent calculated this amount by taking one-fourth of $ 480.07 (the amount of petitioner's last payment before Michael was emancipated), to arrive at $ 120.02, the amount of the payment attributable to alimony. Respondent then multiplied this amount by the number of payments petitioner made in 1985, (25), not including the payment to reimburse Mrs. Zampini for the Christmas gifts, for a total of $ 3,000.50.↩